IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DIANE JEFFREY as parent and next friend
of GLENDA SEROUSE, a minor, et al.,

      Plaintiffs,

v.                                    Civ. No. 01-349 WWD/LCS (ACE)

SUSANNE RATCHNER, et al.,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Defendants' Motion For Summary Judgment

("Motion"), filed January 17, 2002 **[Doc. 64]**.  The Court, having considered the submissions of

the parties, and otherwise being fully advised, finds that the Motion is well taken in part and shall

be granted in part and denied in part.

**Factual Background**[1]

On July 29, 2000, three armed robberies occurred at three businesses located in the

Northeast Heights of Albuquerque:  Spin Cycle [Laundromat], Shoes on a Shoestring, and the

Village Inn, at approximately 4:38 p.m., 4:44 p.m. and 4:48 p.m., respectively.  Hetes Supp. Rpt.,

Ex. 1 to Pls.' Resp.

Defendants Christopher Harmon and Stephen Powers learned of a robbery at the

laundromat on Montgomery and, while driving towards that location, were dispatched to the

robbery at Shoes on a Shoestring ("Shoes").  Defendant Harmon viewed a videotape of the

robbery at Shoes and observed the offender to be an African-American female juvenile with a

---

[1]  Unless otherwise indicated, the facts are taken from the undisputed statements and are
construed in the best light of the Plaintiffs' case.

weapon.[2]  Defendant Harmon was advised of a call from a woman at the Kona Kai apartment complex, located in the same neighborhood as Shoes.  The caller reported that she had observed a white or Hispanic girl and an African American girl near the complex property and thought that one of the girls was not supposed to be there.  Defendant Harmon "[wa]s also advised that the white girl had entered an apartment and returned with a red article of clothing which she gave to the black girl who put it on and that both girls then left the location."  Defs.' Mem. in Support of Mot. at 6, ¶ 9.[3]

Defendants Harmon and Powers investigated the report of the juveniles at the Kona Kai apartments because of the description of the black female and the proximity of the apartments to the robberies.  During their investigation at the Kona Kai apartments, Alexis Hannah told Defendant Powers that she, Plaintiffs Sherouse and Avila, and "Christina" "all stayed the night at Glenda[] [Sherouse's] house[,] . . . . then took a bus to her house[,] . . . . [and that] Glenda and Sylvia then left her house at which time Glenda asked her for a red jacket."  Powers' Rpt. at 7, Ex. 6 to Pls.' Resp.  Ms. Hannah told Officer Powers that "Sylvia [Avila] came over about 4:55 p.m. to pick up a . . . red FUBU sweater."  Statement of Alexis Hannah, Ex. 7 to Pls.' Resp.[4]

---

[2] Plaintiffs disagree with Defendant Harmon's description of the offender seen on the videotape, asserting that the "person in the video-tape is clearly not Glenda Sherouse and resembles an adult rather than a fourteen year old juvenile."  Pls.' Resp. to Defs.' Mot. at 4, ¶ 5.

[3] Although Plaintiffs dispute this statement as "incomplete," they do not dispute that Defendant Harmon learned this information.

[4] Neither Officer Powers' report nor Ms. Hannah's statement clearly describe Ms. Hannah's version of events involving Ms. Hannah and the Plaintiffs.  Nevertheless, drawing all inferences in favor of Plaintiffs, Ms. Hannah was able to account for the Plaintiffs' whereabouts during the time that the robberies occurred and provide a legitimate explanation for the Plaintiffs' presence at the Kona Kai apartments.

Defendant Harmon obtained an address for Plaintiff Avila [at the Wyoming Place apartments], and relayed this information to other officers.  Defendants Harmon and Powers transported Inez Rubio, a victim of the Shoes robbery, to the Wyoming Place Apartments, where Defendant Stone had detained Plaintiffs Sherouse and Avila.  The parties provide conflicting evidence over whether Ms. Rubio positively identified Glenda Sherouse as the offender in the Shoes robbery.  See Dep. of Harmon at 52:19-25, 53:1-6 (indicating that Ms. Rubio positively identified Plaintiff Sherouse as the offender); Aff. of I. Rubio ¶ 7 (indicating that Ms. Rubio "never identified [Plaintiff Sherouse] . . . as the woman who robbed Shoes").  Defendant Harmon was unable to positively identify Plaintiff Sherouse as the offender depicted in the Shoes videotape.

Defendant Martin Smith was dispatched to investigate the armed robbery at the Spin Cycle Laundromat.  The radio dispatcher reported that the offender was a black juvenile female in her late teens with her hair tied up in a bun.  A witness informed Defendant Smith that she observed a black female get into a dark Nissan, which was occupied by two other people.  Defendant Smith transported a witness, Enrique Perez[5], to the Wyoming apartment complex to view the Plaintiffs.  The parties provide conflicting evidence over whether Mr. Perez identified Glenda Sherouse as the offender in the Spin Cycle robbery.  See Dep. of Smith at 7:16-22 (stating that he heard Mr. Perez give "a 99 percent ID of the Black female"); Aff. of Perez ¶¶ 6, 8 (denying that he ever identified [Plaintiff Sherouse] as the Spin Cycle robber; stating that he told the officer he "could not be sure . . . [Plaintiff Sherouse] was the woman that had robbed Spin Cycle" and that race and sex were the only similarities between the two).

---

[5]  Defendants refer to the witness as Enrique Rodriguez; however, the parties do not dispute that they are referring to the same person.

Defendant Joseph Duran was dispatched to investigate the robbery at the Village Inn. There, a witness described the offender as "an African American wom[a]n who had a gun," "was about 5'2", 120 lbs [and] spoke with a southern tone." Statement of Jarrett Miller, Ex. 2 to Pls.' Resp. Defendant Duran transported Jarrett Miller, a victim of the Village Inn robbery, to the Wyoming Place Apartments. Mr. Miller sat in the back seat of Defendant Duran's car and viewed Plaintiff Sherouse. Mr. Miller thought "[a]t first with the big shirt on," Plaintiff Sherouse looked like the offender, but her shirt was not the right color. When Plaintiff Sherouse removed the red sweatshirt, Mr. Miller was uncertain. Defendant Duran subsequently transported Mr. Miller to the police substation.[6] At the substation, Defendant Duran was assigned to sit with Plaintiff Avila in a conference room. At one point, Defendant Duran moved Plaintiffs' handcuffs from her back to her front.

Defendant J. T. Stone learned about the robberies over the police radio and heard "descriptions received via APD dispatch that possible suspects matching the descriptions of the alleged robbers were at a certain apartment." Defs.' Mem. in Support of Mot. at 6, ¶ 7. Defendant Stone also overheard Defendants Harmon and Powers on the police radio, discussing the call regarding the two girls at the Kona Kai apartment complex.[7] Defendant Stone drove to

---

[6] Defendants contend that Officer Duran took Mr. Miller to the substation "so he could give a taped interview at a later time." Defs.' Mem. at 8, ¶ 24. Plaintiffs argue that this allegation is immaterial. In any event, Plaintiffs do not dispute Defendants' assertion that Officer Duran transported Mr. Miller to the police substation.

[7] Plaintiffs contend that Defendant Stone did not hear Defendants Harmon and Powers say that the "possible suspects [seen at the Kona Kai apartments] matched the description of the armed robber." Pls.' Resp. at 4-5, ¶ 7. However, Plaintiffs do not dispute Defendants' assertion that Defendant Stone learned via APD dispatch that "possible suspects matching the descriptions of the alleged robbers were at a certain apartment." Defs.' Mem. at 6, ¶ 7.

the Wyoming Place apartments where he observed two female juveniles [Plaintiffs Sherouse and Avila]. Defendant Stone's attention was drawn to the red FUBU sweatshirt that Plaintiff Sherouse was wearing, because that is what Defendants Harmon and Powers had described in detail. Defendant Stone yelled for the Plaintiffs to come over to his vehicle, patted down Plaintiff Sherouse and placed her in handcuffs, because dispatch had advised the suspects were potentially armed. Later, when the Plaintiffs were taken to the police substation, Defendant Stone transported Plaintiff Sherouse in his vehicle and placed her in an interview room.

Defendants Ylaine Hetes and Susanne Ratchner were called to the Wyoming Place apartments and worked as the lead detectives on the case. Upon her arrival, Defendant Ratchner made contact with Defendant Stone, who informed her about his stop of the Plaintiffs. Defendant Ratchner also made contact with Sgt. Parkins, who briefed her on the three armed robberies. Defendant Ratchner patted down Plaintiff Sherouse and either Defendant Ratchner or Hetes patted down Plaintiff Avila. Defendants Hetes and Ratchner made the decision to transport the Plaintiffs in handcuffs to the substation. The detectives could not positively identify Plaintiff Sherouse as the offender from the Shoes video.

Defendant Hetes handled the investigation of Plaintiff Avila. Defendant Hetes interrogated Plaintiff Avila after advising her of her rights.[8] At some point, Plaintiff Avila's mother, Tracy Baca, arrived at the substation and was permitted to sit with her daughter.[9]

---

[8] Plaintiffs allege that Defendants "questioned the minor Plaintiffs without advising them of their rights." Pls.' Resp. at 9, ¶ 40. However, Plaintiffs do not provide acceptable evidence to support such an allegation.

[9] Plaintiffs allege that Ms. Baca was placed in a dark room and not immediately allowed to sit with her daughter.

Defendant Hetes asked Ms. Baca for permission to search her apartment and Ms. Baca signed a

consent form.  Plaintiff Avila's residence was searched in the presence of Ms. Baca.

Defendant Ratchner handled the investigation of Plaintiff Sherouse.  Some of the

witnesses had stated that Plaintiff Sherouse's hair looked different than the offender's hair.   After

releasing the witnesses, Defendant Ratchner asked Plaintiff Sherouse about her hair and learned

that she had a hair extension.  Defendant Ratchner removed the hair extension, and the detectives

decided to have the witnesses return and view Plaintiff Sherouse again.  None of the witnesses

who returned to the substation, at approximately 8:00 p.m. to 8:30 p.m., could positively identify

Plaintiff Sherouse.  Defendant Ratchner decided to hold Plaintiff Sherouse until the search of

Plaintiff Avila's residence was completed.  Defendant Hetes decided not to book Plaintiff

Sherouse on charges of armed robbery, and she was released at approximately 9:00 p.m. to 9:30

p.m.  Plaintiff Avila was also released from custody, presumably at the same time as Plaintiff

Sherouse.

In this case, Plaintiffs allege that the Defendants violated their constitutional rights under

the Fourth and Fourteenth Amendments.  Plaintiffs also allege that Defendants engaged in tortious

conduct in violation of New Mexico state law.

**Standard of Review**

The Court may enter summary judgment when the motion papers, affidavits, and other

evidence submitted by the parties show that no genuine issue exists as to any material fact, and

that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  A

"genuine issue" exists where the evidence before the Court is of such a nature that a reasonable

jury could return a verdict in favor of the non-moving party as to that issue.  <u>Anderson v. Liberty</u>

Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of

the case.  Id. at 248.  Judgment is appropriate "as a matter of law" if the nonmoving party has

failed to make an adequate showing on an essential element of its case, as to which it has the

burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Court

assumes the evidence of the non-moving party to be true, resolves all doubts against the moving

party, construes all evidence in the light most favorable to the non-moving party, and draws all

reasonable inferences in the non-moving party's favor.  Hunt v. Cromartie, 526 U.S. 541, 551-52

(1999).

When a defendant raises the affirmative defense of qualified immunity in a summary

judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated

a constitutional or statutory right and that the right at issue was clearly established at the time of

the defendant's unlawful conduct.  Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If

the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.

Id. at 1156.  If the plaintiff does establish the violation of a clearly established constitutional or

statutory right, then the burden shifts to the defendant to prove that there are no genuine issues of

material fact and that he or she is entitled to judgment as a matter of law.  Id.

### Discussion

*I.    Plaintiffs' Claims against Defendant Macario Page*

Defendants request the dismissal of Plaintiffs' claims against Defendant Macario Page,

contending that he "had no involvement whatsoever in the investigation involving either plaintiff."

Defs.' Mem. in Support of Mot. at 14.  Defendant Page explains that he "was not on duty and did

not participate [in] or supervise the detectives' actions."  Id.  Plaintiffs do not contend that

7

Defendant Page personally participated in any of the allegedly unlawful conduct at issue in this lawsuit.

A supervisory official's liability for the actions of a third party or coworker under section 1983 must be predicated upon that supervisory official's deliberate participation or conscious acquiescence in the deprivation of constitutional rights; mere negligence in supervising the third party or coworker is not enough. Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1250 (10th Cir. 1999).

Although Plaintiffs have deposed Defendants Page, Hetes and Ratchner, they do not point to any evidence to support a claim of supervisory liability with respect to Defendant Page. In a footnote, Plaintiffs contend they "reasonably anticipate that the internal affairs documents submitted to Magistrate Judge Smith may present evidence which would support a claim for supervisory liability." Pls.' Resp. in Opp'n to Defs.' Mot. at 2 n.2. However, Plaintiffs fail to explain the basis for such anticipation. Under these circumstances, I find Plaintiffs' speculative anticipation of evidence to be an insufficient basis on which to grant Plaintiffs' relief from summary judgment under FED. R. CIV. P. 56(f). Accordingly, because there is no evidence to support a claim of supervisory liability against Defendant Page, Plaintiffs' claims against Defendant Page will be dismissed.[10]

### II.   Plaintiffs' claims against Defendants Harmon, Powers, Smith and Duran

Defendants move for summary judgment with respect to four of the individual Defendants, arguing that Plaintiffs "have not identified the specific conduct [of these individuals]. . . which

---

[10] At the pretrial conference held on October 7, 2002, the parties indicated they have agreed to dismiss Defendant Page from this lawsuit.

8

gives rise to Plaintiffs' claims."  Defs.' Mem. in Support of Mot. at 14.[11]  In response to

Defendants' argument that the claims against Defendants Harmon, Powers, Smith and Duran

should be dismissed, Plaintiffs assert that the Defendants engaged in the following conduct:

*Defendants Harmon and Powers*

Plaintiffs argue that Officers Harmon and Powers possessed "overwhelming exculpatory

information"[12] regarding the Plaintiffs and yet "failed to take action to secure the[ir] prompt and

immediate release" from custody.  Pls.' Resp. at 17.  Officer Harmon testified that, based on the

information he knew, he lacked sufficient grounds on which "to arrest [Plaintiff Sherouse] and

take her to jail."  Harmon dep. at 76:8-11, Ex. 5 to Pls.' Resp.

*Defendant Smith*

Plaintiffs contend that the evidence indicates that Defendant Smith "engaged in the

unlawful search and seizure of the Plaintiffs."  Pls.' Resp. at 18.  Plaintiffs also contend that

Defendant Smith learned through witness Enrique Perez that "the only link between . . . Plaintiff

Sherouse and the armed robber at the Spin [C]ycle was that both were black and female."  Pls.'

Resp. at 18.  Plaintiffs allege that based on this information, Defendant Smith violated their

constitutional rights by failing to intervene in order "to prevent the continued violation of

[Plaintiff Sherouse's] and . . . Plaintiff Avila's constitutional rights."  Pls.' Resp. at 18.

*Defendant Duran*

---

[11]  Defendants do not raise this argument with respect to Defendants Hetes, Ratchner and Stone.

[12]  Plaintiffs allege that Defendants' viewing of the videotape, the information obtained from Alexis Hannah, and their awareness that neither Ms. Rubio nor Jennifer Farr positively identified the Plaintiffs constituted overwhelming exculpatory information.

Plaintiffs allege that Officer Duran was an "active participant" and "failed to intervene . . . to prevent the continued deprivation of [] Plaintiffs' constitutional rights," despite possessing "exculpatory information concerning the description of the Village Inn armed robber."  Pls.' Resp. at 17.  Plaintiffs also appear to argue that Defendant Duran, who was assigned to sit with Plaintiff Avila at the substation, should have intervened by removing her handcuffs and releasing Plaintiff Avila from custody.

Plaintiffs argue that the liability of Defendants Harmon, Powers, Smith and Duran arises from their alleged failure to intervene to prevent the deprivation of Plaintiffs' constitutional rights. It is clearly established "that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  Hall v. Burke, 12 Fed. Appx. 856, 861, 2001 WL 6914142, at **4 (10th Cir. Jun. 12, 2001) (not published in Federal Reporter) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)) (emphasis added).  Further, an officer who fails to intervene may be liable for the harm caused by the actions of other officers "where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official."  Id. (emphasis added).  For liability to attach, "there must have been a realistic opportunity to intervene to prevent the harm from occurring."  Id.

Defendants Harmon and Powers responded to and investigated the robbery that occurred at Shoes; Defendant Smith responded to the robbery at the Spin Cycle Laundromat; and Defendant Duran investigated the Village Inn robbery.  Plaintiffs point to no evidence that any of these Defendants detained, arrested, transported or questioned either Plaintiff.  With the exception

of Defendant Duran, Plaintiffs do not allege that these Defendants handcuffed either Plaintiff.[13]

Plaintiffs do not identify Defendant Smith's conduct that allegedly constituted an unlawful search

and seizure.  Nor do Plaintiffs specify how Defendant Duran's conduct constituted "active

participation" in the violation of Plaintiffs' rights.

　　　　With respect to Plaintiffs' argument that these four Defendants failed to intervene, there is

no evidence to show that Defendants Harmon, Powers, Smith, and Duran observed or had reason

to know that any of Plaintiffs' constitutional rights were being violated.  The evidence indicates

that each officer investigated only one of the three robberies that occurred.  There is no evidence

that the officers interviewed witnesses from more than one robbery.  Thus, even if each Defendant

concluded there was no probable cause to arrest Plaintiffs for the robbery that he investigated,

there is no evidence to suggest that he knew that probable cause was lacking for Plaintiffs' arrest

for another robbery.

　　　　Moreover, I find that with respect to Plaintiffs' constitutional claims, Plaintiffs have failed

to meet the requisite level of specificity in describing both the clearly established constitutional

right and the conduct of Defendants Harmon, Powers, Smith and Duran that allegedly violated

that right.  See Meinert v. City of Prairie Village, 87 F.Supp.2d 1175, 1179 (D.Kan. 2000) (citing

Romero v. Fay, 45 F.3d 1472 (10th Cir. 1995)) (internal citations and quotation marks omitted)

(explaining that where qualified immunity is raised as a defense, plaintiff is "required to articulate

the clearly established constitutional right and the defendant's conduct which violated the right

with specificity . . . and demonstrate a substantial correspondence between the conduct in

---

　　　　[13]  At the substation, Officer Duran moved Plaintiff Avila's handcuffs from back to front;
however, there is no evidence that he initially handcuffed Plaintiff Avila.

question and prior law").  Thus, qualified immunity also applies as a defense to Plaintiffs'
constitutional claims against these Defendants.  For all of these reasons, Plaintiffs' constitutional
claims against Defendants Harmon, Powers, Smith and Duran will be dismissed.

In addition, Plaintiffs apparently concede that they lack evidence to support their claims
that Defendants Harmon, Powers, Smith and Duran committed the intentional torts of assault,
battery, false arrest and false imprisonment.  See Pls.' Resp. at 18.  Thus, Plaintiffs' tort claims of
assault, battery, false arrest and false imprisonment against Defendants Harmon, Powers, Smith
and Duran will also be dismissed.  See also Hatheway v. Thies, No. Civ. 00-1200 MCA/RLP,
Mem. Op. and Order [Doc. 69] (D.N.M. May 30, 2002) (finding defendants entitled to summary
judgment on plaintiff's state claims of assault, battery, false arrest and false imprisonment
following summary judgment on plaintiff's Fourth Amendment civil rights claims); Mason v.
Stock, 955 F.Supp. 1293, 1304-05 (D.Kan. 1997) (citing Wilson v. Meeks, 98 F.3d 1247, 1254
(10th Cir. 1996); Wright v. Montgomery Ward & Co., 814 F.Supp. 986, 988-90 (D.Kan. 1993))
(finding that ruling on constitutional claims also disposed of state tort claims of false arrest and
false imprisonment).

However, I agree with Plaintiffs that Defendants have failed to move for summary
judgment on Plaintiffs' negligence claims.[14]  Further, Defendants do not cite any opinion holding
that the dismissal of a negligence claim under N.M.S.A. § 41-4-12 should necessarily follow the
dismissal of civil rights claims and intentional tort claims against one defendant, where claims

---

[14]  Although Defendants request the Court to dismiss "[a]ll claims against these
individuals," they argue that Plaintiffs lack support only for "their claims that these individuals
have violated their civil rights or . . . [committed] an intentional tort" under New Mexico law.
Defs.' Mem. in Support of Mot. at 16.

remain against other defendants in the same lawsuit.  Thus, at this time, the Court declines to dismiss Plaintiffs' negligence claims against Defendants Harmon, Powers, Smith and Duran.[15]

      *III.     Plaintiffs' Claims of Unlawful Arrest*

For purposes of analyzing Fourth Amendment issues, the Tenth Circuit has divided interactions between police and citizens into three categories:  consensual encounters, investigative stops, and arrests.  <u>Oliver v. Woods</u>, 209 F.2d 1179, 1186 (10th Cir. 2000).  Neither party alleges that the interactions that occurred between Plaintiffs and Defendant officers constituted  a consensual encounter.

An investigative stop occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000) (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972)).  In order to be reasonable under the Fourth Amendment, investigative stops must meet two requirements:  1)  The officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity," <u>id.</u> (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)), and 2) The detention that follows the initial stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out" in this context, <u>United States v. Holt</u>, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

---

[15] Defendants request permission "to supplement their motion to include a claim for summary judgment on the tort [negligence] claims."  Defs.' Reply at 8.  As such, Defendants' request amounts to a request for an enlargement of the deadline for filing dispositive motions, and will be denied.

An arrest is a seizure that is "characterized by [a] highly intrusive or lengthy search or detention." Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The Fourth Amendment requires that in order to be reasonable, an arrest must be supported by probable cause. United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993) ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). Further, probable cause must exist "at the moment the arrest was made"; it cannot be established by evidence made known to the police after the arrest is made. United States v. Lacy, No. 00-2096 (10th Cir. May 31, 2001) (citing Beck v. State of Ohio, 379 U.S. 89, 91 (1964)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Oliver, 209 F.3d at 1186 (quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

In their motion for summary judgment, Defendants characterize the events that occurred on July 29, 2000 between Plaintiffs and Defendants as an investigatory stop based on Defendants' reasonable suspicion. Defendants argue that reasonable suspicion developed into probable cause to support an arrest when at least one eyewitness to an armed robbery positively identified Plaintiff Sherouse as the offender. Plaintiffs contend that they were unlawfully arrested without reasonable suspicion or probable cause. The Court concludes that the interactions between Plaintiffs and Defendants began as an investigatory stop at the Wyoming Place Apartments, and eventually progressed into a de facto arrest when the Plaintiffs were transported to the police substation.

1.      Events at the Wyoming Place Apartments

Defendant Stone encountered the Plaintiffs after learning about the robberies and hearing descriptions of the suspect from a police dispatcher.  In addition, he heard Defendants Harmon and Powers, who were investigating the robbery at Shoes, describe two girls seen at the Kona Kai apartments and also learned that "possible suspects matching the descriptions of the alleged robbers were at [the Wyoming Place] apartment[s]."  In response to this information, Defendant Stone drove to the Wyoming Place apartments and observed Plaintiffs, at which time he initiated an investigative stop.  An investigative stop at that time and location was justified at its inception because, based on the totality of the circumstances, Defendant Stone had a reasonable suspicion that Plaintiffs were involved in one or more of the three armed robberies that had occurred earlier that afternoon.  In addition to learning that the "possible suspects" might be at the Wyoming Place apartments, Defendants have identified a number of facts supporting Defendant Stone's initial detention of Plaintiffs Sherouse and Avila.

In particular, Defendant Stone had reason to suspect Plaintiffs' involvement in a crime based on the Plaintiffs' proximity to one of the robberies and because Plaintiff Sherouse matched a general description of the armed robber in race, sex, and approximate age.  Moreover, Defendant Stone noted that Plaintiff Sherouse was wearing a red FUBU sweater, which he remembered hearing Officers Harmon and Powers describe in detail as the article of clothing provided to Plaintiff Sherouse by Plaintiff Avila, thus supporting a reasonable suspicion that Plaintiff Sherouse was trying to change her appearance or conceal her identity with the assistance

of Plaintiff Avila.[16]

Moreover, Defendant Stone did not act unreasonably by requiring the Plaintiffs to approach him, "patting-down" or "frisking" Plaintiff Sherouse for weapons, handcuffing Plaintiff Sherouse and requiring Plaintiff Avila to place her hands on his car.  An investigative detention does not necessarily preclude the use of certain security measures when there are objective, reasonable concerns about officer safety.   See United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996); see also United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002) (explaining that an investigative detention "does not become unreasonable just because police officers use handcuffs").  At the time that Defendant Stone initially detained Plaintiffs, he was the only officer on the scene and had reason to believe that at least one of the suspects might be armed.  Under these circumstances, Defendant Stone took appropriate security measures.  Because Defendant Stone acted reasonably with respect to the initial stop and investigative detention of Plaintiffs at the Wyoming Place apartments, he did not exceed the allowable scope of an investigative detention.  Consequently, he is entitled to summary judgment on Plaintiffs' civil rights claims arising from his conduct at that time.  However, even if Officer Stone's initial detention did violate Plaintiffs' rights, I do not believe a reasonable officer would understand that detaining Plaintiffs under these circumstances would violate the Constitution.  Accordingly, qualified immunity applies as well as a defense against this claim.

"Although [Plaintiffs'] seizure was reasonable at its inception, [the Court] must determine whether it was reasonable as conducted."  Perdue, 8 F.3d at 1462 (10th Cir. 1993).  If police

---

[16]  Plaintiffs do not dispute Defendants' assertion that providing a change of clothing to a felon could arguably violate N.M.S.A § 30-22-4 (harboring or aiding a felon).

officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent.  Id.  Defendants maintain that neither the length of time that Plaintiffs were detained, nor the fact that they were handcuffed transformed the investigatory stop into an arrest, while Plaintiffs assert that Defendants' actions transformed the investigatory stop into a de facto arrest.

*Length of Time*

Defendants contend that the length of Plaintiffs' detention did not transform the investigatory stop into an arrest.  It is not clear precisely how long Plaintiffs were detained at the Wyoming Place apartments before being transported to the police substation.[17]  However, Plaintiffs do not dispute Defendants' assertion that Plaintiffs were held at the apartments while witnesses from all three robberies were brought to the scene to view them.

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  United States v. Sharpe, 470 U.S. 675, 686 (1985).  Plaintiffs do not allege that Defendants' decision to bring witnesses to the scene was not a diligent pursuit of a means of investigation that was likely to confirm or dispel their suspicions quickly.  United States v. Soto-Cervantes, 138 F.3d 1319, (10th Cir. 1998) (finding that a 15-20 minute detention to allow for INS officers to reach the scene was not unreasonable); Shareef, 100 F.3d at 1507 (finding a 45 minute detention reasonable where officers diligently pursued a means of

---

[17]  Plaintiffs allege that they were "detained for over an hour [presumably at the Wyoming Place apartments] while . . . officers arrived and witnesses were brought to them."  Pls.' Resp. at 23.

17

investigation); <u>United States v. McCarthy</u>, 77 F.3d 522, (1st Cir. 1996) (finding a 75 minute

detention during an investigatory stop not unreasonable); <u>Meinert v. City of Prairie Village</u>, 87

F.Supp.2d 1175, 1182 (D.Kan. 2000) (concluding that an 8 minute delay required to transport an

eyewitness to the scene for a "show-up" identification was constitutionally acceptable).  Plaintiffs

do not allege that they were held at the apartments longer than necessary for witnesses from each

robbery to view them.  Moreover,  the failure of any one witness to identify a suspect as the

offender would not necessarily dispel a reasonable suspicion where witnesses from other locations

have yet to view the suspects.  Under these circumstances, I find that the length of time that

Plaintiffs were detained at the Wyoming Place apartments did not transform the investigatory stop

into a <u>de facto</u> arrest.

*Use of Force*

An investigative detention does not necessarily preclude the use of certain security

measures when there are objective, reasonable concerns about officer safety.   <u>See</u> <u>Shareef</u>, 100

F.3d at 1502 ("The use of firearms, handcuffs, and other forceful techniques does not necessarily

transform a <u>Terry</u> detention into a full custodial arrest . . . when the circumstances reasonably

warrant such measures.").  Furthermore, "we should not engage in unrealistic second-guessing of

a police officer's decision."  <u>Neff</u>, 300 F.3d at 1220 (10th Cir. 2002) (citations omitted).

Plaintiffs do not dispute Defendants' argument that Plaintiffs Sherouse and Avila were

held at the Wyoming Place Apartments while "[w]itnesses from all three robberies were brought

to the scene."  Defs.' Mem. at 12.  Once other officers began arriving, Plaintiffs were presumably

outnumbered by the officers on the scene.  However, the evidence indicates that some of the

officers were not continuously present because they were transporting witnesses between the

18

apartments and the locations of the robberies.  Under these circumstances, "the officers could

reasonably believe it to be imprudent to rely on there always being someone intently watching

[Plaintiffs].  Distractions happen."  Neff, 300 F.3d at 1221.  Moreover, it was not unreasonable

for the officers to fear that Plaintiffs might attempt to flee.  See, e.g., Shareef, 100 F.3d at 1507

(finding officers justified in keeping a suspected wanted felon in handcuffs while they attempted to

investigate his identity).  Thus, I conclude, that while bordering on an arrest, "the precautionary

measures of force employed by the officers were reasonable under the circumstances."  Neff, 300

F.3d at 1221 (quoting Shareef, 100 F.3d at 1506).

Finally, Plaintiffs do not point to any clearly established law that would indicate to the

officers that their conduct was unreasonable under these circumstances.  Thus, to the extent that

Plaintiffs' length of detention at the apartments and/or the use of handcuffs exceeded the scope of

an investigatory stop, such errors were reasonable mistakes regarding the constraints on police

conduct.  Accordingly, qualified immunity applies as well as a defense against a claim that the use

of handcuffs or the length of time that Plaintiffs were detained at the apartments were

unreasonable and transformed the investigatory stop into a custodial arrest.

2.      Events at the Substation

As previously indicated, the conditions of Plaintiffs' investigative detention at the

apartments bordered on an arrest.  Moreover, it is clearly established that the permissible scope

and duration of an investigative stop generally does not include transporting a suspect to a police

station without probable cause.  Hayes v. Florida, 470 U.S. 811, 815 (1985) ("[T]ransportation to

and investigative detention at the station house without probable cause . . . violates the Fourth

Amendment."); Dunaway v. New York, 442 U.S. 200, 211-16 (1979); United States v. Gonzalez,

19

763 F.2d 1127, 1133 (10th Cir. 1985).  Defendants do not allege that exigent circumstances prompted the decision to transport the Plaintiffs to the substation.  Under these circumstances, I find that Defendants exceeded the scope of an investigative stop when they transported Plaintiffs in handcuffs to the police substation, and at that point, their conduct required probable cause.[18]

When, as here, a defense of qualified immunity is raised in the context of the Fourth Amendment, the Court applies two distinct standards of reasonableness.  First, in determining whether a defendant's actions violated a specific right, the Court must decide whether the defendant conducted a search or seizure that was "unreasonable" under the Fourth Amendment. Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search or seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001).

Defendants contend that "probable cause existed for the arrest of Glenda Sherouse when the officers received a positive identification from a witness [Inez Rubio]," thus, Plaintiffs' arrest was reasonable.  Defs.' Mem. at 21.  Were this an undisputed fact, Defendants most likely would be entitled to qualified immunity.  However, in this case, the critical fact of whether a witness positively identified Plaintiff Sherouse is in sharp dispute.

---

[18]  Moreover, the conditions present during Plaintiffs' transportation to and detention at the substation were almost indistinguishable from those of an arrest.  The Plaintiffs were separated, transported in handcuffs, and placed in interview or conference rooms, where they were questioned and/or interrogated by Detectives Hetes and Ratchner.  Witnesses were brought to the substation and asked to view the Plaintiffs.  Plaintiffs were not free to leave and remained handcuffed during most, if not all of their detention.

20

Plaintiffs contend that no witness ever positively identified Plaintiff Sherouse as the robber.  Indeed, Plaintiffs point to evidence that Ms. Rubio "told officers that [Plaintiff Sherouse] was <u>not</u> the woman that had robbed Shoes on a Shoestring."   Aff. of Rubio ¶ 6 (emphasis added).  Thus, under Plaintiffs' version of the facts, no witness positively identified Plaintiff Sherouse as the robber, and at least one witness affirmatively stated that Plaintiff Sherouse was not the offender.  After viewing the videotape, the officers and detectives were unable to positively identify Plaintiff Sherouse as the robber.  Alexis Hannah provided a legitimate explanation for the Plaintiffs' presence at the Kona Kai apartments.  No weapons were found on Plaintiffs and neither Plaintiff admitted involvement in the robberies.  Given these set of facts, Defendants would have lacked probable cause to believe that Plaintiffs had committed a crime.

However ,because a key fact underlying a determination of whether the Defendants had probable cause to arrest the Plaintiffs is in dispute, the Court is unable to conclude whether Plaintiffs' arrest was reasonable.  Summary judgment on qualified immunity grounds is not appropriate under these circumstances.  <u>Thomas v. Roach</u>, 165 F.3d 137, 143 (6th Cir. 1999) (summary judgment on qualified immunity not appropriate where facts determinative of reasonableness in dispute) ; <u>see</u> <u>Kaspar v. City of Hobbs</u>, 32 Fed. Appx. 521, 523, 2002 WL 481556 at *2 (10th Cir. Apr. 1, 2002) (explaining that disputed issues of fact precluded a grant of qualified immunity).  Consequently, Defendants' motion for summary judgment on Plaintiffs' claim of unlawful arrest with respect to their detention at the substation, will be denied.

IV.     *Plaintiffs' Unlawful Interrogation Claim*

Defendants move for dismissal of Plaintiffs' claim that they were unlawfully interrogated, arguing that no federal law requires that a juvenile's parent be present during an interrogation.

Further, Defendants contend that Plaintiff Sherouse was never interrogated, and that Plaintiff

Avila's mother was present while she was interviewed by Defendant Hetes.  Plaintiffs claim that

their questioning was unlawful "because it was non-consensual and was done pursuant to their

unlawful seizures."  Pls.' Resp. at 33.

      In one sense, the parties' arguments on this issue are academic, in that Plaintiffs do not

claim they made any inculpatory statements in response to questioning or interrogation.

Moreover, Plaintiffs present no evidence to counter Defendants' argument that Plaintiff Sherouse

was not interrogated.  Finally, while Plaintiffs' allegations that they were questioned and/or

interrogated pursuant to an unlawful arrest may be relevant to the issue of damages, they do not

state an independent civil rights claim.  See James v. Unified Sch. Dist. No. 512, 959 F.Supp.

1407, 1412 (D.Kan. 1997) (citing Bennett v. Passic, 545 F.2d 1260, 1263 (10th Cir. 1976))

(explaining that an officer's failure to warn the plaintiff of his Miranda rights before custodial

interrogation does not subject the officer to liability under the Civil Rights Act).[19]  Accordingly,

Defendants' motion for summary judgment on Plaintiffs' unlawful interrogation claim will be

granted.

     V.    *Plaintiffs' Excessive Force Claim*

      Plaintiffs claim that Defendants used excessive force when they applied excessively tight

handcuffs that allegedly resulted in the Plaintiffs' suffering sore, red and bruised wrists for several

days.  Defendants move for summary judgment on Plaintiffs' excessive force claim.

      In Graham v. Connor, the Supreme Court held that all constitutional claims for excessive

---

[19]  Plaintiffs do not provide evidence that Defendants failed to warn Plaintiffs of their
rights.

22

force "in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." Palmer v. Unified Gov't of Wyandotte County, 72 F.Supp.2d 1237, 1246 (D.Kan. 1999) (citing Graham v. Connor, 490 U.S. 386, 397 (1989)) (internal quotations omitted). "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. Id.

In determining whether the force used was objectively reasonable, the court is to consider "the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officer, and whether the subject is resisting arrest." Wilson v. Meeks, 52 F.3d 1547, 1553 (10th Cir. 1995). "In addition, an assessment of the degree of force actually used is critical to the balancing test used to determine if the force was excessive." Rucker v. Hampton, No. 01-7022, Order and Judgment (10th Cir. Oct. 18, 2002) (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)) (unpublished) .

Defendants argue that Plaintiffs' excessive force claim should be dismissed because the officers "were justified in their use of the handcuffs." Defs.' Mem. at 24. Although justification in the use of handcuffs does not necessarily preclude a claim of excessive force, see, e.g., McPherson v. Auger, 842 F.Supp. 25 (D.Me. 1994) (denying summary judgment to officer on plaintiff's excessive force claim regarding the officer's use of handcuffs to effect a lawful arrest), the right to arrest an individual carries with it the right to use some degree of physical coercion or threat thereof to effect the arrest, Yeager v. City of Claflin, 1998 WL 160997, at *11 (D.Kan. Mar. 4, 1998) (citing Thompson v. City of Lawrence, Kansas, 58 F.3d 1511, 1516 (10th Cir.

1995)).[20]  Thus, Defendants were entitled to exert some degree of force in order to arrest

Plaintiffs.

Defendants also argue for dismissal of Plaintiffs' excessive force claim because "Plaintiffs

do not really claim to have received any physical injuries from the handcuffing."  Defs.' Mem. at

23-24 (citing Bella v. Chamberlain, 24 F.3d 1251, 1257 (10th Cir. 1994)).  As Plaintiffs correctly

point out, however, the Tenth Circuit has "decline[d] to adopt a 'bright-line' standard dictating

that force cannot be 'excessive' unless it leaves visible cuts, bruises, abrasions or scars."  Holland

ex rel. Overdorff v. Harrington,  268 F.3d 1179, 1195  (10th Cir. 2001).  Thus, establishing that

physical injuries occurred is not a prerequisite to raising an excessive force claim.

However, even though Plaintiffs are not necessarily required to demonstrate physical

injuries, the degree of force is a critical factor in determining whether the force used was

excessive.  See, e.g., Yeager v. City of Claflin, 1998 WL 160997, at *11 (D.Kan. Mar. 4, 1998)

(citing Britschge v. Harmison, 947 F.Supp. 455, 440 (D. Kan. 1996) (explaining that the extent of

the injuries sustained is a relevant factor in assessing the reasonableness of the force used).  Here,

the injuries that Plaintiffs allege are relatively minor and temporary.  Neither Plaintiff sought

medical attention for their injuries.  Thus, the extent of Plaintiffs' injuries indicates that the degree

of force used by Defendants was relatively slight.

 Applying the framework set forth in Graham to Plaintiffs' allegations of excessively tight

handcuffing, I conclude that Defendants' conduct was objectively reasonable under the totality of

the circumstances. Plaintiffs were unarmed and thus, posed no immediate threat to the safety of

---

[20]  As previously noted, Defendants were also justified in using handcuffs during the
investigatory stop of Plaintiffs at the Wyoming Place apartments.

the officers.  In addition, Plaintiffs were compliant, cooperative and did not resist arrest or attempt to flee from the officers.  However, the severity of the crimes at issue, three armed robberies, was relatively high.  Defendants were justified in using handcuffs during both the investigatory stop and the arrest, and the degree of force used was minimal.

I am troubled by Plaintiffs' allegations suggesting that Defendants refused to respond to their complaints that the handcuffs were too tight.[21]  However, while these allegations may be relevant on the issue of damages, they do not rise to the level of a constitutional violation.  See Rucker v. Hampton, No. 01-7022, Order and Judgment (10th Cir. Oct. 18, 2002) (unpublished) (citing Martin v. Bd. of County Comm'rs, 909 F.2d 402, 407 (10th Cir. 1990) (stating that a plaintiff must show the amount of force used was sufficiently egregious to be of constitutional dimensions); Palmer, 72 F.Supp.2d at 1248 (citations omitted) (noting that "while loosening tight handcuffs may be the most compassionate action, the failure to do so does not rise to a clearly established constitutional violation").

Finally, Plaintiffs fail to meet their burden under the second prong of the qualified immunity analysis of demonstrating that the constitutional right allegedly violated was clearly established at the time the violation occurred.[22]  Thus, even if the Defendants' conduct did violate Plaintiffs' rights, I do not believe a reasonable officer would understand that such conduct would violate the Constitution.  Accordingly, qualified immunity applies as well as a defense against this

---

[21]  Plaintiffs do not specifically identify the officer or officers to whom they allegedly complained.

[22]  "Ordinarily, in order for the law to be clearly established, there must be a Supreme court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

claim.

VI.    *Plaintiffs' Claims Regarding the Search of their Persons*

Defendants move for the dismissal of Plaintiffs' claims that they were unlawfully searched. I have determined that Defendant Stone was justified in conducting a pat-down of Plaintiff Sherouse.  Likewise, I find that the pat-down of Plaintiff Avila, by either Defendant Hetes or Ratchner was not unreasonable.  Legitimate safety concerns existed regarding the possible presence of a weapon to justify conducting such a search.  Moreover, I find that even if Plaintiff Sherouse was patted down a second time by either Detective Hetes or Ratchner, it was not unreasonable.  To the extent that a second pat-down of Plaintiff Sherouse exceeded the scope of the investigatory stop, I find that such an error was a reasonable mistake under the circumstances.

Plaintiff Sherouse also claims that she was "searched" when Defendant Ratchner removed her hair extension.  However, Plaintiffs do not cite any opinion indicating that such an action constitutes a search.[23]  Thus, while the removal of Plaintiff Sherouse's hairpiece may be relevant to the issue of damages, it does not support a claim that she was subjected to an unlawful search. Accordingly, Plaintiffs' claims that Defendants unlawfully searched their persons will be dismissed.

VII.    *Plaintiff Avila's Claim Regarding the Search of her Residence*

Defendants move for summary judgment on Plaintiff Avila's claim that the search of her residence was unlawful under the Fourth Amendment.  Defendants state that because Plaintiff Avila's mother, Tracy Baca, consented to the search, it was not unreasonable.  Plaintiffs argue

---

[23]  Defendant Ratchner testified that she questioned Plaintiff Sherouse about her hair because she was "trying to identify her or eliminate her as the armed robber."  Ratchner Dep. at 34:7-12, Ex. 10 to Pls.' Resp.

that factual disputes regarding the voluntariness of Ms. Baca's consent preclude summary judgment on this claim.  Plaintiffs do not allege that any inculpatory evidence was found during the search of Plaintiff Avila's residence.

The Fourth Amendment generally prohibits warrantless searches, unless they fall within a specific exception to the warrant requirement.  United States v. Karo, 468 U.S. 705, 717 (1984).  Consent is one such exception to the warrant requirement.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Defendants point to a written consent form, signed by Ms. Baca, as evidence of her voluntary consent to the search of her home.  Plaintiff does not dispute that Ms. Baca signed the written consent form, however, she contends that Ms. Baca's consent was not voluntary.

Plaintiff points to an affidavit, completed more than five months following Ms. Baca's deposition, in which Ms. Baca alleged that "[t]he police implied that Sylvia would not be released unless I permitted them to search my apartment."  Baca aff. ¶ 11, Ex. D to Pls.' Resp. to Defs.' First Mot. for Summ. J. ¶ 9 (emphasis added).  I find this allegation too vague and conclusory to qualify as evidence of Defendants' coercive conduct.  Ms. Baca did not indicate what the police said or did to imply that Plaintiff Avila would not be released unless Ms. Baca consented to a search.  Nor did Ms. Baca identify the officer or officers who communicated such an implication.  Ms. Baca claimed that she "did not feel free to refuse to allow police to search my house, and [] felt coerced and bullied into consenting to the search."[24]  Baca aff. ¶ 11 (emphasis added).  However, Ms. Baca did not describe any conduct of the officers that constituted an effort to

---

[24]  I note that Ms. Baca's allegation that she felt coerced is not, by itself, sufficient to call into question the voluntariness of her consent.  See Elsken v. Network Multi-Family Sec. Corp. 49 F.3d 1470, 1476 (10th Cir.1995) ("Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment.").

coerce her consent.[25]  Id. ¶11 (emphasis added).  Indeed, Ms. Baca did not explain how any particular conduct forced her to consent.  Thus, Ms. Baca fails to allege a causal nexus between the officers' conduct and her feeling of being coerced or bullied into consenting.

Finally, Ms. Baca does not contend that she would not have consented to a search had the police officers conducted themselves differently.  Indeed, Ms. Baca was asked at her deposition if she "would have said no" had the officers "asked [her] about the search differently."  Baca dep. at 30:22-25 & 31:1, Ex. 11 to Pls.' Resp.  Rather than answering in the affirmative, Ms. Baca merely expressed a desire to know the reason for the search.  Thus, there is no evidence to suggest that Ms. Baca would have refused consent even if she had not "felt" coerced.

In light of the totality of the circumstances, I find that Ms. Baca's consent to search her residence was voluntary.  Defendants point to a written consent form, signed by Ms. Baca, as evidence that Ms. Baca consented to the search of her residence.  Plaintiff fails to provide evidence that Ms. Baca's consent was not voluntary.  Because Plaintiff Avila's mother consented to the search of her residence, the search of Plaintiff's residence was not unreasonable under the Fourth Amendment.  Accordingly, summary judgment will be granted in Defendants' favor on Plaintiff Avila's claim that Defendants violated her constitutional rights when they conducted a search of her residence.

### Conclusion

For all of the reasons set forth in this opinion, Defendants' Motion for Summary Judgment will be GRANTED in part and DENIED in part.

---

[25]  For example, although Ms. Baca alleged that at some point, a police officer "yelled" at her, she did not indicate what the officer said.  Nor does she allege or establish any association between the yelling and the voluntariness of her consent.

WHEREFORE,

IT IS ORDERED that with respect to all of Plaintiffs' claims against Defendant Macario

Page, Defendants' Motion for Summary Judgment is GRANTED, and Plaintiffs' claims against

Defendant Page are dismissed with prejudice.

IT IS FURTHER ORDERED that with respect to all of Plaintiffs' § 1983 claims (Counts

I-III) and Plaintiffs' claims of assault, battery, false arrest and false imprisonment (Count IV)

against Defendants Harmon, Powers, Smith and Duran, Defendants' Motion for Summary

Judgment is GRANTED.

IT IS FURTHER ORDERED that, to the extent Defendants move for summary judgment

with respect to Plaintiffs' claims of negligence (Count IV) against Defendants Harmon, Powers,

Smith and Duran, Defendants' Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that with respect to Plaintiffs' claims of unlawful arrest

(Count I) arising from Plaintiffs' detention at the Wyoming Place apartments, Defendants' Motion

for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that with respect to Plaintiffs' claims of unlawful arrest

against Defendants Ratchner, Hetes and Stone arising from Plaintiffs' detention at the substation,

Defendants' Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that with respect to Plaintiffs' claims of unlawful

interrogation (Count I), Defendants' Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that with respect to Plaintiffs' claims of excessive force

(Count II), Defendants' Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that with respect to Plaintiffs' claims of unlawful search of

their persons and Plaintiff Avila's claim of unlawful search of her residence (Count III),

Defendants' Motion for Summary Judgment is GRANTED.

_____
UNITED STATES MAGISTRATE JUDGE